IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

KIMBERLY TRIPLETT,                      )
    Plaintiff,                          )
                                   )
          v.                           )        Civil No. 3:19cv104 (MHL)
                                   )
ANDREW M. SAUL,[1]                      )
Commissioner of Social Security,        )
    Defendant.                          )
                                   )

<u>REPORT AND RECOMMENDATION</u>

On February 27, 2015, Kimberly Triplett ("Plaintiff") applied for Social Security

Disability Benefits ("DIB") under the Social Security Act ("Act"), alleging disability from

fibromyalgia and chronic fatigue syndrome, with an alleged onset date of January 4, 2014.  The

Social Security Administration ("SSA") denied Plaintiff's claim both initially and upon

reconsideration.  Thereafter, an Administrative Law Judge ("ALJ") denied Plaintiff's claim in a

written decision and the Appeals Council denied Plaintiff's request for review, rendering the

ALJ's decision as the final decision of the Commissioner ("Defendant").

Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g),

arguing that the ALJ erred by:  (1) finding at step two that none of Plaintiff's medically

determinable impairments qualified as severe; and, (2) making an inconsistent and confusing

residual functional capacity ("RFC") finding to justify her conclusion that Plaintiff did not suffer

---

[1]    On June 4, 2019, the United States Senate confirmed Andrew M. Saul to a six-year term
as the Commissioner of Social Security.  Pursuant to Federal Rule of Civil Procedure 25(d),
Commissioner Saul should be substituted for former Acting Commissioner Nancy A. Berryhill
as the defendant in this matter.

from any severe impairments. (Pl.'s Br. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") (ECF No. 15) at 4-14.) This matter now comes before the Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on the parties' cross-motions for summary judgment, rendering the matter ripe for review.[2] For the reasons that follow, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 14) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 16) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

## I.    PROCEDURAL HISTORY

On February 27, 2015, Plaintiff filed an application for DIB with an alleged onset date of January 4, 2014. (R. at 94.) The SSA denied this claim initially on August 10, 2015, and again upon reconsideration on December 28, 2015. (R. at 102, 114.) At Plaintiff's written request, the ALJ held a hearing on December 5, 2017. (R. at 27-57, 130-31.) On January 18, 2018, the ALJ issued a written opinion, denying Plaintiff's claim and concluding that Plaintiff did not qualify as disabled under the Act. (R. at 15-22.) On December 13, 2018, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision as the final decision of the Commissioner subject to review by this Court. (R. at 1-6.)

## II.    STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court "will affirm the Social Security Administration's disability determination 'when an ALJ has applied correct legal

---

[2]    The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments, and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

standards and the ALJ's factual findings are supported by substantial evidence.'" *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)). Substantial evidence requires more than a scintilla but less than a preponderance, and includes the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Indeed, "the substantial evidence standard 'presupposes . . . a zone of choice within which the decision makers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.'" *Dunn v. Colvin*, 607 F. App'x. 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)).

To determine whether substantial evidence exists, the court must examine the record as a whole, but may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1157 (2019) (holding that the substantial-evidence inquiry requires case-by-case consideration, with deference to the presiding ALJ's credibility determinations). In considering the decision of the Commissioner based on the record as a whole, the court must "take into account whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, bind the reviewing court to affirm regardless of whether the court disagrees with such findings. *Hancock*, 667 F.3d at 477. If substantial evidence in the record

3

does not support the ALJ's determination or if the ALJ has made an error of law, the court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

SSA regulations set forth a five-step process that the agency employs to determine whether disability exists. 20 C.F.R. § 404.1520(a)(4); *see Mascio*, 780 F.3d at 634-35 (describing the ALJ's five-step sequential evaluation). To summarize, at step one, the ALJ looks at the claimant's current work activity. § 404.1520(a)(4)(i). At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements. § 404.1520(a)(4)(ii). Step three requires the ALJ to determine whether the medical impairments meet or equal an impairment listed in the regulations. § 404.1520(a)(4)(iii). Between steps three and four, the ALJ must assess the claimant's RFC, accounting for the most that the claimant can do despite her physical and mental limitations. § 404.1545(a). At step four, the ALJ assesses whether the claimant can perform her past work given her RFC. § 404.1520(a)(4)(iv). Finally, at step five, the ALJ determines whether the claimant can perform any work existing in the national economy. § 404.1520(a)(4)(v).

### III.    THE ALJ'S DECISION

On December 5, 2017, the ALJ held a hearing during which Plaintiff (represented by counsel) and a vocational expert ("VE") testified. (R. at 27-57.) On January 18, 2018, the ALJ issued a written opinion, finding that Plaintiff did not qualify as disabled under the Act. (R. at 15-22.)

The ALJ followed the five-step evaluation process established by the Act in analyzing Plaintiff's disability claim. (R. at 18-22.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of January 4, 2014. (R. at 18.) Between steps one and two, the ALJ found that Plaintiff suffered from the following medically

4

determinable impairments: mild obstructive sleep apnea, bilateral open angle glaucoma,[3] bilateral cataracts, shingles, hypertension, dizziness/vertigo, fibromyalgia[4] and chronic fatigue syndrome ("CFS").[5] (R. at 18.) At step two, the ALJ found that none of Plaintiff's medically determinable impairments, either singly or in combination, qualified as severe, because Plaintiff's impairments did not significantly limit (or could not be expected to significantly limit) Plaintiff's ability to perform basic work-related activities for twelve consecutive months. (R. at 18.) Accordingly, the ALJ found that Plaintiff did not qualify as disabled under the Act. (R. at 22.)

## IV. ANALYSIS

Plaintiff, age fifty-four at the time of this Report and Recommendation, previously worked as a vocational rehabilitation counselor. (R. at 112.) She applied for Social Security benefits, alleging disability from fibromyalgia and CFS. (R. at 94.) Plaintiff's appeal to this Court alleges that the ALJ erred by: (1) finding at step two that none of Plaintiff's medically determinable impairments qualified as severe; and, (2) making an inconsistent and confusing RFC finding to justify her conclusion that Plaintiff did not suffer from any severe impairments. (Pl.'s Mem. at 4-14.) For the reasons set forth below, the ALJ did not err in her decision.

---

[3]     Glaucoma describes a group of eye diseases "usually characterized by an increase in intraocular pressure that causes pathologic changes in the optic disk and typical defects in the field of vision." *Glaucoma*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).

[4]     Fibromyalgia denotes "pain and stiffness in the muscles and joints that either is diffuse or has multiple trigger points." *Fibromyalgia*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).

[5]     Patients with CFS experience extreme fatigue that cannot be explained by an underlying medical condition. Chronic Fatigue Syndrome, Mayo Clinic (Aug. 13, 2019), https://www.mayoclinic.org/diseases-conditions/chronic-fatigue-syndrome/symptoms-causes/syc-20360490. "The fatigue may worsen with physical or mental activity, but does [not] improve with rest." *Id.*

**A.      The ALJ Sufficiently Explained the Weight Afforded to the Medical Opinions of Record and Substantial Evidence Supports the Weight Assigned.**

Plaintiff first argues that the ALJ erred at step two by improperly assigning little to no weight to the medical opinions of record, all of which found that Plaintiff suffered from at least one severe impairment. (Pl.'s Mem. at 5-8, 11-14.) Defendant responds that substantial evidence supports the ALJ's step-two findings, including the ALJ's treatment of the medical opinions. (Def.'s Mot. for Summ. J. & Br. in Supp. Thereof ("Def.'s Mem.") at 13-21.)

At step two, the ALJ must consider the claimant's medically determinable impairments. 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1521. Plaintiff has the burden of demonstrating that she has an "impairment or combination of impairments which significantly limits [her] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c); *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987). "The Supreme Court has held that this step of the disability evaluation is a *de minimis* threshold." *Williams v. Astrue*, 2010 WL 395631, at *14 (E.D. Va. Feb. 2, 2010), *R. & R. adopted*, at *1 (citing *Bowen*, 482 U.S. at 146-47).

To qualify as severe, a claimant's impairment "must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. § 404.1509. A severe impairment causes more than a minimal effect on one's ability to function. § 404.1520(c). Likewise, "[a]n impairment or combination of impairments is not severe if it does not significantly limit [one's] physical or mental ability to do basic work activities." § 404.1522(a). An ALJ will find a claimant not disabled at step two if she "do[es] not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . , or a combination of impairments that is severe and meets the duration requirement." § 404.1520(a)(4)(ii).

Here, the ALJ found that Plaintiff suffered from mild obstructive sleep apnea, bilateral open angle glaucoma, bilateral cataracts, shingles, hypertension, dizziness/vertigo, fibromyalgia

6

and CFS, but concluded that none of these impairments qualified as severe. (R. at 18.) In reaching her conclusion, the ALJ first considered Plaintiff's subjective complaints, including that she suffered from chronic pain, fatigue at a level of four out of ten, weakness and difficulty maintaining her posture. (R. at 19.) After listing Plaintiff's daily activities, the ALJ further noted Plaintiff's complaints of difficulty concentrating and performing complex tasks, as well as impaired short-term memory. (R. at 19.) The ALJ acknowledged Plaintiff's testimony that she required one- to two-hour rest periods in the afternoon to control her pain and fatigue, and that she would stay in bed all day three or four times each month due to her vertigo. (R. at 19.) And the ALJ reiterated Plaintiff's testimony that her impairments caused her to miss work two to three times a month. (R. at 19.)

The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to produce her alleged symptoms, but that Plaintiff's statements concerning the intensity, persistence and limiting effects of those symptoms proved inconsistent with "medical evidence and other evidence in the record." (R. at 19.) Specifically, the ALJ concluded that Plaintiff "received either brief, routine, conservative treatment, or, at times, more involved treatment, but in either case, there is no evidence that these impairments resulted in lasting sequelae." (R. at 19.)

After reviewing the objective medical evidence, the ALJ found that Plaintiff adequately controlled her impairments with medication "such that [the impairments did] not affect [her] life." (R. at 20.) The ALJ noted that Plaintiff's hypertension remained under control and proved "asymptomatic" and that Plaintiff's sleep apnea "is not being treated." (R. at 20.) The ALJ acknowledged that Plaintiff received ongoing treatment for her glaucoma and cataracts, but that "there is no evidence of a reduction in [Plaintiff's] vision" despite treatment. (R. at 20.)

7

As for Plaintiff's fibromyalgia and related CFS, the ALJ observed that Plaintiff received successful medicative treatment that controlled her symptoms. (R. at 20.) The ALJ added that Plaintiff retained the ability to drive, do laundry, clean her house, go grocery shopping, wake her son and prepare him for school, assist her son with his homework and take her son to Tae Kwon Do practice on time. (R. at 20.) Ultimately, the ALJ found no evidence showing "ongoing symptoms, complications, or required specialized treatment," rendering Plaintiff's impairments non-severe. (R. at 20.) The ALJ then considered the medical opinions of record, assigning all of them little to no weight, which Plaintiff now challenges in her appeal. (R. at 21; Pl.'s Mem. at 5-8, 11-14.)

1.   **_The ALJ Provided a Sufficient Explanation for the Weight Afforded to the State Agency Physician Opinions and Substantial Evidence Supports the Weight Assigned._**

Plaintiff argues that the ALJ improperly afforded little weight to the opinions of the state agency physicians, because "[t]he ALJ merely summarized the opinions in the record, and then declared that they were inconsistent with routine or conservative treatment methods." (Pl.'s Mem. at 8.) Plaintiff contends that the ALJ failed to properly explain the inconsistencies between the medical opinions and the evidence of record, and that the ALJ further failed to address how she reached an opposite conclusion (i.e., that Plaintiff suffered from no severe impairments) to "every opinion of record." (Pl.'s Mem. at 8.) Defendant responds that the ALJ properly afforded little weight to the state agency opinions. (Def.'s Mem. at 20-21.)

During the sequential analysis, when the ALJ determines whether the claimant has a medically-determinable severe impairment, or combination of impairments which would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence

8

resulting from consultative examinations or medical expert evaluations that have been ordered.

20 C.F.R. §§ 404.1512, 404.1527.  When the record contains a number of different medical

opinions, including those from the claimant's treating physician(s), consultative examiners or

other sources that are consistent with each other, then the ALJ makes a determination based on

that evidence.  § 404.1527(c).  If, however, the medical opinions are internally inconsistent with

each other, or other evidence, the ALJ must evaluate the opinions and assign them respective

weight to properly analyze the evidence involved.  § 404.1527(c)(2)-(6), (d).

Requiring an ALJ to assign specific weight to medical opinions is necessary, because a

reviewing court "faces a difficult task in applying the substantial evidence test when the

[Commissioner] has not considered all relevant evidence." *Arnold v. Sec'y of Health Educ.*

*& Welfare*, 567 F.2d 258, 259 (4th Cir. 1977).  Unless the Commissioner "has sufficiently

explained the weight [s]he has given to obviously probative exhibits, to say that h[er] decision is

supported by substantial evidence approaches an abdication of the court's duty to scrutinize the

record as a whole to determine whether the conclusions reached are rational." *Id.* (quoting

*Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)) (internal quotation marks omitted).  The

assignment of weight needs to be sufficiently specific "to make clear to any subsequent

reviewers the weight the adjudicator gave to the . . . source's medical opinion and the reasons for

that weight." SSR 96-2p (discussing affording weight to treating physician).  Accordingly, a

reviewing court cannot determine if substantial evidence supports an ALJ's findings "unless the

[ALJ] explicitly indicates the weight given to all the relevant evidence." *Gordon v. Schweiker*,

725 F.2d 231, 235 (4th Cir. 1984) (citing *Myers v. Califano*, 611 F.2d 980, 983 (4th Cir. 1980);

*Strawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979); *Arnold*, 567 F.2d at 259)).

State agency medical consultants are highly qualified physicians who are experts in Social Security disability evaluation. 20 C.F.R. § 404.1513a(b)(1). Therefore, when considering the opinion of a state agency medical consultant, the ALJ must evaluate those findings just as he would for any other medical opinion. § 404.1513a(b)(1). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ is required to explain the weight given to state agency opinions. § 404.1527(e).

On August 10, 2015, as part of the initial review of Plaintiff's DIB claim, Richard Surrusco, M.D., completed an assessment of Plaintiff's medically determinable impairments and resulting RFC. (R. at 97-99.) After reviewing Plaintiff's records, Dr. Surrusco affirmed that Plaintiff suffered from one or more medically determinable impairments. (R. at 97.) Specifically, Dr. Surrusco listed code "2480" as Plaintiff's only impairment, which, according to the SSA's Program Operations Manual System ("POMS") guidelines, denotes when a claimant's medical records establish a diagnosis but no predetermined code of a "medical nature" applies to that diagnosis.[6] Soc. Sec. Admin., Program Operations Manual System § DI 26510.015 (Jan. 13, 2017); (R. at 98.) Dr. Surrusco characterized Plaintiff's diagnosed-but-unlisted impairment as "severe." (R. at 98.) In considering Plaintiff's subjective complaints, Dr. Surrusco opined that Plaintiff's diagnosed-but-unlisted impairment could reasonably be expected to produce her alleged symptoms and that the objective medical evidence, alone, substantiated the intensity, persistence and limiting effects of those symptoms as endorsed by Plaintiff. (R. at 98.)

Based on Plaintiff's impairments and his review of her medical records, Dr. Surrusco found that Plaintiff had the RFC to occasionally lift, carry or pull up to twenty pounds and to

---

[6]     The SSA's coded list of medical diagnoses follows "a simplified version of the International Classification of Diseases (ICD) full code." Soc. Sec. Admin., Program Operations Manual System § DI 26510.015 (Jan. 13, 2017).

10

frequently lift, carry or pull up to ten pounds. (R. at 98.)  In Dr. Surrusco's estimation, Plaintiff could stand or walk for a total of two hours and sit for a total of six hours in an eight-hour workday. (R. at 98-99.)  And Plaintiff had no limitations in her ability to push or pull, other than to the extent that her impairments limited her ability to lift or carry. (R. at 99.)  In support of these exertional limitations, Dr. Surrusco cited to Plaintiff's pain from possible fibromyalgia and CFS, as well as Plaintiff's polyarthritis. (R. at 99.)  And Dr. Surrusco denied that Plaintiff's impairments resulted in postural, manipulative, visual, communicative or environmental limitations. (R. at 99.)  Ultimately, Dr. Surrusco limited Plaintiff to only sedentary work activities, noting Plaintiff's reports of fatigue. (R. at 99.)

On reconsideration of Plaintiff's claim, William Rutherford, Jr., M.D., reviewed Plaintiff's medically determinable impairments and assessed Plaintiff's RFC. (R. at 109-11.) Like Dr. Surrusco, Dr. Rutherford noted that Plaintiff suffered from a diagnosed impairment that had no medical list code, characterizing the diagnosed-but-unlisted impairment as severe. (R. at 109.)  Dr. Rutherford also found that Plaintiff suffered from hypertension and sleep-related breathing disorders; though, in his estimation, neither impairment qualified as severe. (R. at 109.)  After reviewing Plaintiff's records, Joseph Leizer, Ph.D., separately found that Plaintiff suffered from no medically determinable mental impairments, explaining that although Plaintiff complained of difficulty concentrating and focusing, she could clean, do laundry, organize and help her son with homework. (R. at 109.)  Dr. Leizer further found no objective evidence that indicated any severe mental impairments. (R. at 109.)

In considering Plaintiff's subjective complaints, Dr. Rutherford opined that Plaintiff's medically determinable impairments could reasonably be expected to produce her alleged symptoms, but that the objective medical evidence did not substantiate Plaintiff's statements

11

regarding the intensity, persistence and limiting effects of those symptoms. (R. at 110.) And Dr. Rutherford found Plaintiff only partially credible. (R. at 110.) Ultimately, Dr. Rutherford adopted the same RFC findings as Dr. Surrusco. (R. at 111.)

The ALJ reviewed the opinions of Drs. Surrusco and Rutherford in reaching her step-two conclusion. (R. at 21.) After reciting the exertional limitations endorsed by both physicians, the ALJ afforded their opinions little weight, explaining that the opinions proved internally inconsistent. (R. at 21.) Specifically, the ALJ noted that although both doctors determined that Plaintiff had no severe impairments, they nonetheless reduced her RFC to the sedentary level. (R. at 21.) The ALJ further opined that the evidence of record did not support a sedentary RFC, explaining that "routine treatment" resolved Plaintiff's symptoms and that she did not require specialized treatment, rehabilitation or extensive follow-ups. (R. at 21.)

The Court finds the ALJ's explanation for the weight assigned to both opinions legally sufficient. Although the ALJ incorrectly stated that both Drs. Surrusco and Rutherford found no severe impairments, (R. at 21), the Court finds no error in the overall conclusion of the ALJ that the opinions of both physicians proved internally inconsistent. Indeed, although Dr. Surrusco and Dr. Rutherford both found that Plaintiff had a severe impairment, they codified that impairment as diagnosed but unlisted in the SSA's list of impairment codes. (R. at 98, 109.) Notably, the POMS provides codes for fibromyalgia (7290), CFS (9330), glaucoma (3650), cataracts (3660), essential hypertension (4010) and sleep-related breathing disorders (7800) that neither doctor listed as a severe impairment. Soc. Sec. Admin., Program Operations Manual System § DI 26510.015 (Jan. 13, 2017); (R. at 98, 109.)

Importantly, the ALJ relied not only on the internal inconsistencies in both opinions to justify the weight afforded to each, but also found external inconsistencies between the opinions

12

and the objective medical evidence, which showed that Plaintiff's symptoms responded well to treatment. (R. at 21.)  Although Plaintiff argues that the ALJ failed "to explain how the evidentiary record was inconsistent with every opinion," the Court finds the ALJ's explanation sufficient, because the ALJ's explanation followed a narrative discussion of the "routine treatment" to which she referred. (R. at 19-20); *see Ross v. Berryhill*, 2019 WL 289101, at *6 (E.D. Va. Jan. 3, 2019) ("The ALJ need not repeat herself by regurgitating [the evidence of record] each time that she considers an opinion." (citing *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014))), *report and recommendation adopted*, 2019 WL 281191 (E.D. Va. Jan. 22, 2019); *cf. Dunn*, 607 F. App'x at 273 (affirming the ALJ's reasoning that the claimant received "treatment [that] has been essentially routine and conservative in nature" (internal quotations and citations omitted)). Therefore, the ALJ's explanation regarding the external inconsistencies between the state agency physicians' findings and Plaintiff's successful treatment builds the logical bridge necessary for this Court to perform a meaningful review.

Indeed, the Court's own review of the record finds substantial support for the ALJ's conclusion that Plaintiff's treatment successfully resolved her symptoms. For example, as the ALJ correctly noted, although Phillip Fuller, M.D., diagnosed Plaintiff with obstructive sleep apnea in November 2013, (R. at 19, 400), medical records show that Plaintiff received no significant treatment for her sleep apnea after she stated in March 2014 that she would try using Provent[7] for one month, (R. at 360 (noting in March 2014 that Dr. Gray would follow up with Plaintiff after one month of trying Provent, but showing no follow-up records)).

---

[7]    According to its manufacturers, "Provent Sleep Apnea Therapy is a disposable, nightly-use nasal device placed just inside the nostrils and held securely in place with hypoallergenic adhesive." Powerful, Portable, Proven, Provent, Provent Sleep Apnea Therapy (Aug. 13, 2019), https://www.proventtherapy.com/about-provent-sleep-apnea-therapy.php. The Provent device "creates pressure when [a patient] exhale[s] to keep [the patient's] airway open." *Id.*

13

The ALJ also appropriately characterized Plaintiff's hypertension as "mild, controlled, and asymptomatic." (R. at 19.)  Indeed, Dr. Gray described Plaintiff's hypertension as "benign" and "stable" following medicative treatment. (R. at 371 (July 2014), 377 (March 2015), 492 (September 2015), 597 (June 2017); *see also* 647 (blood pressure "well controlled" in November 2016).)  Plaintiff also self-described her hypertension as "mild-moderate." (R. at 368 (July 2014), 375 (March 2015), 490 (September 2015).)  And Plaintiff's cardiovascular system otherwise appeared normal throughout her treatment. (R. at 276 (regular heartrate and rhythm in March 2013), 338 (regular rate and rhythm with no murmurs, gallops or rubs in September 2013), 349 (same in December 2013), 359 (same in March 2014), 377 (same in March 2015), 491 (same in September 2015), 560 (normal rate and rhythm in March 2016), 599 (normal rate and rhythm with no murmurs, gallops or rubs in June 2017), 617 (same in April 2017), 642 (same in February 2017), 669 (same in August 2016).)

Plaintiff likewise successfully controlled her vertigo, dizziness and shingles with medication, which the ALJ noted in her discussion of Plaintiff's treatment records. (R. at 19-20.)  Plaintiff first complained of dizziness in March 2013, at which time Plaintiff's attending physician described her as alert and oriented, with equal, round and reactive pupils. (R. at 276.)  A computed tomography ("CT") scan of Plaintiff's brain also revealed "no acute intercranial process." (R. at 287.)  Ultimately, Plaintiff's physician discharged her with instructions to drink plenty of fluids and a prescription for Antivert (a dizziness medication). (R. at 285.)  Plaintiff again complained of dizziness during a September 2013 appointment with Dr. Gray, but Dr. Gray nonetheless described Plaintiff as oriented and in no acute distress. (R. at 337-38; *see also* R. at 359 (describing Plaintiff as oriented and in no acute distress despite dizziness in March 2014), 377 (same in March 2015).)  And, by March 2016, Plaintiff denied symptoms of

14

dizziness. (R. at 558.) Moreover, during her hearing, Plaintiff confirmed that she no longer took medication for her vertigo. (R. at 42.) As for Plaintiff's shingles, the record reveals only one appointment addressing that impairment, during which Dr. Gray instructed Plaintiff to start a prescription of Valtrex and use oatmeal baths for comfort. (R. at 667-69.) Plaintiff did not complain of shingles following that appointment.

Plaintiff's glaucoma and cataracts also responded well to treatment. Plaintiff first complained of blurred vision in July 2013. (R. at 447.) During that appointment, Sarah E. Pilat, O.D., noted Plaintiff's history with cataracts and glaucoma, recording that Plaintiff underwent laser treatment for her glaucoma in 2010. (R. at 447.) Based on her examination, Dr. Pilat diagnosed Plaintiff with bilateral primary open angle glaucoma, myopia (nearsightedness), astigmatism and presbyopia (farsightedness), recommending follow-up treatment and prescription glasses. (R. at 450.) In August 2015, Plaintiff revisited Dr. Pilat for a follow-up examination, which revealed cataracts and glaucoma in both of Plaintiff's eyes. (R. at 454.) Upon referral from Dr. Pilat, on September 21, 2015, Plaintiff treated with Thomas Falkenberg, M.D., who diagnosed Plaintiff with several forms of cataracts. (R. at 498-500.) On October 1, 2015, Plaintiff had the cataracts removed from her right eye and an intraocular lens implanted. (R. at 502.) Thereafter, Plaintiff's eyes showed improvement and stabilized, with an intraocular pressure ("IOP")[8] reduction of 15 percent or more after Plaintiff underwent additional laser glaucoma treatment and started using prescription eye drops. (See R. at 449 (recording initial

---

[8]   Intraocular pressure describes the pressure in the eye "produced by the continual renewal of fluids within the interior of the eye." Pressure, Dorland's Illustrated Medical Dictionary (32d ed. 2012). Patients with glaucoma experience increased intraocular pressure. Id. An IOP reading between 12-22 mmHg falls within a normal range. What is Considered Normal Eye Pressure?, Glaucoma Research Found. (Aug. 13, 2019), https://www.glaucoma.org/q-a/what-is-considered-normal-pressure.php.

IOP of 25-30 mmHg in right eye and 25-27 mmHg in left eye in July 2013), 499 (recording

20/30+2 corrected vision in right eye and 20/20 corrected vision in left eye before cataract

removal), 507 (noting stable eye condition following cataract removal in October 2015), 532-33

(recording 20/20 distance vision bilaterally and IOP reduction of 15 percent or more with IOP of

13 mmHg in right eye and 18 mmHg in left eye in July 2017), 536-37 (same with IOP of 15

mmHg in right eye and 20 mmHg in left eye in April 2017), 540-41 (same with IOP of 16 mmHg

in right eye and 26 mmHg in left eye in March 2017), 544-45 (same with IOP of 16 mmHg in

right eye and 22 mmHg in left eye in January 2017), 547-48 (same with IOP of 18 mmHg in

right eye and 23 mmHg in left eye in December 2016).)

As for Plaintiff's fibromyalgia and CFS, the ALJ found that Plaintiff successfully treated

both impairments with medication, maintaining normal strength and a normal range of motion

throughout her treatment — a finding that the record supports.  (R. at 20.)  Plaintiff first

complained of fatigue during a September 2013 appointment with Dr. Gray, reporting that she

required a nap after two hours of rigorous activity.  (R. at 337.)  Upon referral from Dr. Gray, on

June 30, 2014, Plaintiff treated with Avnit Ahuja, M.D., to rule out the possibility that Plaintiff's

fatigue resulted from an auto-immune disorder.  (R. at 405.)  During that appointment, Plaintiff

exhibited a normal range of motion and normal strength in her extremities, and Dr. Ahuja

provided information to Plaintiff about Lyrica and Cymbalta, prescription drugs designed to treat

fibromyalgia and CFS.  (R. at 407.)

During a July 2014 follow-up appointment, Plaintiff expressed concern with using Lyrica

and Cymbalta due to their potential side effects, explaining that she treated her pain with

Tylenol.  (R. at 299.)  Plaintiff again exhibited a normal range of motion and normal strength

despite some tenderness in her spine.  (R. at 301.)  Dr. Ahuja recommended that Plaintiff try

Ultracet to treat her symptoms. (R. at 302.) A year later, in July 2015, Plaintiff reported that she went to the gym three times a week, engaging in strength training and cycling. (R. at 418.) Plaintiff again exhibited a normal range of motion and normal strength. (R. at 421.)

In August 2015, Plaintiff reported feeling better, resting better and "doing well" after starting Tramadol, refusing other medicative options and again exhibiting a normal range of motion. (R. at 456, 458.) Moreover, although Plaintiff complained of lower-back pain in April 2017 following a fall, (R. at 615), she showed improvement after attending physical therapy, (R. at 676; *see also* R. at 688 (reporting gradual improvement in her lower-back pain in November 2017)). Indeed, by November 2017, Plaintiff had normal muscle tone and a normal range of motion in her torso, including painless range of motion with full flexion and extension, as well as normal sensation and strength in her lower extremities. (R. at 689.)

Plaintiff's reported daily activities further support the ALJ's conclusion that Plaintiff's treatments successfully managed her symptoms. During her hearing before the ALJ, Plaintiff testified that she could drive, perform household chores and dress and prepare her son for school, though she rested during the afternoon. (R. at 31-33.) Once her son returned from school, Plaintiff testified that she helped him with his homework and drove him to Tae Kwon Do practice. (R. at 33.) Specifically, Plaintiff checked her son's homework for errors and tutored him when he could not grasp concepts. (R. at 39.) Plaintiff also took her son to the movie theater and played games with him. (R. at 34.) And, in August 2017, Plaintiff rode fourteen hours in a car, with breaks, to a vacation at Walt Disney World in Florida. (R. at 34-35.) Plaintiff testified that she grocery-shopped once a week, adding that it would be the only activity that she performed that day. (R. at 35.) Plaintiff later clarified that on "bad days" she remained bedridden. (R. at 41.) Overall, Plaintiff's testimony supports the ALJ's conclusion that, with

treatment, Plaintiff retained the physical and mental ability to perform work-related functions. (R. at 20.)

Because the ALJ provided a legally sufficient explanation for the weight assigned to the state agency physician opinions, and because substantial evidence supports the weight assigned, the Court finds no error.

2.     *The ALJ Provided a Sufficient Explanation for the Weight Afforded to Dr. Gray's Opinion and Substantial Evidence Supports the Weight Assigned.*

Plaintiff argues that the ALJ also erred in assigning little to no weight to the opinion of Plaintiff's treating physician, Dr. Gray. (Pl.'s Mem. at 7-8.) Specifically, Plaintiff reiterates that the ALJ "failed to engage in any real analysis of the opinion evidence provided[,] . . . merely summariz[ing] the opinions in the record, and then declar[ing] that they were inconsistent with routine or conservative treatment methods." (Pl.'s Mem. at 8.) Plaintiff adds that the evidence of record supports Dr. Gray's opinion, entitling his opinion to controlling weight under the treating physician rule. (Pl.'s Mem. at 12-13.) Defendant responds that the ALJ sufficiently explained the weight afforded to Dr. Gray's opinion and that substantial evidence supports the weight assigned. (Def.'s Mem. at 18-20.)

Under the applicable regulations and caselaw, a treating source's opinion must be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2); *Lewis v. Berryhill*, 858 F.3d 858, 867 (4th Cir. 2017); *Craig*, 76 F.3d at 590; SSR 96-2p. Only an "acceptable medical source" may be considered a treating source that offers an opinion entitled to controlling weight. SSR 06-3p.[9] Acceptable medical sources

_____

[9]     Effective March 27, 2017, the SSA rescinded SSR 96-2p and 06-3p, instead incorporating some of the Rulings' policies into 20 C.F.R. §§ 404.1527(f), 416.927(f). 82 Fed.

include licensed physicians, licensed or certified psychologists and certain other specialists, depending on the claimed disability. §§ 404.1513(a), 404.1527(a). The regulations also provide for the consideration of opinions from "other sources," including nurse-practitioners, physician's assistants or therapists. SSR 06-03p; § 404.1527(f).[10] Further, the regulations do not require that the ALJ accept opinions from a treating source in every situation, *e.g.*, when the source opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or when the treating source's opinion is inconsistent with other evidence or when it is not otherwise well-supported. § 404.1527(c)(3)-(4), (d).

Courts generally should not disturb an ALJ's decision as to the weight afforded a medical opinion absent some indication that the ALJ "dredged up 'specious inconsistences.'" *Dunn v. Colvin*, 607 F. App'x at 267 (citing *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992)). Indeed, an ALJ's decision regarding weight afforded a medical opinion should be left untouched unless the ALJ failed to give a sufficient reason for the weight afforded. *Id.*

The ALJ must consider the following when evaluating a treating source's opinion: (1) the length of the treating source relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and the medical record; (5) any specialization on the part of the

---

Reg. 5844-01, at 5844-45, 5854-55 (Jan. 18, 2017). Plaintiff filed her claim on February 27, 2015, before this regulation took effect. (R. at 94.) The Agency does not have the power to engage in retroactive rulemaking. *Compare Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (requiring Congress to expressly convey the power to promulgate retroactive rules due to its disfavored place in the law), *with* 42 U.S.C. § 405(a) (granting the Agency the general power to make rules, but not granting retroactive rulemaking power). Because the regulation does not have retroactive effect, SSR 06-03p applies to Plaintiff's claim.

[10]    The regulations detail that "other sources" include medical sources that are not considered "acceptable medical sources" under 20 C.F.R. §§ 404.1527(f) and 416.927(f). The given examples are a non-exhaustive list. SSR 06-03p.

treating source; and, (6) any other relevant factors.  § 404.1527(c).  However, those same

regulations specifically vest the ALJ — not the treating source — with the authority to determine

whether a claimant is disabled as that term is defined under the Act.  § 404.1527(d)(1).

On November 2, 2017, Dr. Gray — Plaintiff's primary care physician — completed a

Fibromyalgia Residual Functional Questionnaire, which described Plaintiff's capacity between

2013 and the date of the opinion.  (R. at 671.)  Dr. Gray confirmed that Plaintiff satisfied the

criteria for fibromyalgia, but he denied that she suffered from any other diagnosed impairments.

(R. at 671.)  Dr. Gray opined that Plaintiff had a "fair" prognosis, though he marked that

Plaintiff's fibromyalgia had lasted, or could be expected to last, at least twelve months.  (R. at

671.)  Dr. Gray opined that Plaintiff experienced several symptoms, including:  multiple tender

points, nonrestorative sleep, chronic fatigue, morning stiffness, cognitive impairments, and

numbness and tingling.  (R. at 671.)  Dr. Gray described Plaintiff's pain as "chronic" and

"widespread," marking that Plaintiff experienced pain throughout her spine as well as in her

shoulders, arms, hands, fingers, hips, legs, knees, ankles and feet.  (R. at 671-72.)  Dr. Gray

noted that Plaintiff's pain worsened with stress, fatigue, minimal activity and changing weather,

though he denied that emotional factors contributed to the severity of Plaintiff's symptoms and

limitations.  (R. at 672.)

In assessing Plaintiff's RFC, Dr. Gray marked that Plaintiff's pain frequently interfered

with her ability to maintain attention and concentration.  (R. at 672.)  Dr. Gray further noted that

Plaintiff had marked limitations in her ability to handle work-related stress, though he denied

that Plaintiff suffered from any medication-related side effects that impacted her ability to work.

(R. at 672.)  Dr. Gray estimated that Plaintiff could walk one to two city blocks without rest or

severe pain.  (R. at 672.)  And Dr. Gray limited Plaintiff to less than two hours of sitting or

standing/walking at one time. (R. at 673.) Dr. Gray affirmed that Plaintiff required a job that permitted her to shift positions at will, and he marked that Plaintiff would need to lie down at unpredictable intervals during a workday. (R. at 673.) As for Plaintiff's ability to lift and carry objects, Dr. Gray limited Plaintiff to frequently (i.e., between one- to two-thirds of the workday) carrying less than ten pounds, occasionally (i.e., less than one-third of a workday) carrying ten to twenty pounds, and never carrying more than twenty pounds. (R. at 673.) Although Dr. Gray denied that Plaintiff had any significant limitations in reaching, handling or fingering, he wrote that she could grasp, turn and twist objects only 50 percent of the time during a workday, finger only 50 percent of the time and reach for objects only 15 percent of the time. (R. at 673.) And Dr. Gray marked that Plaintiff could bend and twist at the waist only occasionally. (R. at 673.) Ultimately, Dr. Gray estimated that Plaintiff's impairments and treatment would cause her to miss more than three days of work each month. (R. at 674.)

The ALJ assigned "little to no weight" to Dr. Gray's opinion, explaining that the "evidence does not support th[e] level of limitation" endorsed by Dr. Gray. (R. at 21.) Specifically, the ALJ found that the evidence revealed "relatively mild intermittent symptoms that resolve[d] with routine treatment." (R. at 21.) The Court finds the ALJ's explanation legally sufficient, because the ALJ explained what exactly in the record proved inconsistent with Dr. Gray's findings (i.e., that Plaintiff's treatment resolved her relatively mild symptoms), and because the ALJ's explanation followed a narrative discussion of Plaintiff's treatment and how it resolved her symptoms. Moreover, the Court's own review of the record finds substantial evidence to support the ALJ's assignment of weight.

Indeed, as mentioned, although Plaintiff frequently complained of fatigue and weakness, Plaintiff managed her symptoms with medications. (R. at 302 (recording that Plaintiff had

21

started taking Ultracet), 418 (recording that Plaintiff attended the gym three times a week), 456 (recording that Plaintiff felt better, rested better and was "doing well" after starting Tramadol).) And, as the ALJ correctly noted, Plaintiff frequently exhibited normal strength and a normal range of motion despite some tenderness.  (R. at 20, 297, 301, 407, 419-20, 458, 587, 676, 688-89.)  By November 2017, Plaintiff had normal muscle tone and a normal range of motion in her torso, including painless range of motion with full flexion and extension, as well as normal sensation and strength in her lower extremities.  (R. at 689.)  Moreover, Plaintiff testified that she could drive, perform household chores, prepare her son for school and drive him to extracurricular activities, tutor her son and check his homework, and ride for fourteen hours straight to Florida with some breaks.  (R. at 31-35, 39.)  Dr. Gray based his RFC assessment solely on his diagnosis of fibromyalgia, denying that Plaintiff suffered from any other diagnosed impairments, (R. at 671); yet, Plaintiff's treatment for fibromyalgia and CFS showed improvement and stabilization following medicative treatment such that she could perform activities of daily living that proved inconsistent with the degree of limitation endorsed by Dr. Gray.  Therefore, the Court finds that substantial evidence supports the weight assigned to Dr. Gray's opinion.  Accordingly, the ALJ did not err at step two. [11]

---

[11]    Because Plaintiff narrows her step-two challenge to only the ALJ's assessment of the medical opinions, the Court need not engage in an extensive review of the ALJ's step-two conclusion that none of Plaintiff's impairments qualified as severe.  Nonetheless, the Court finds that the ALJ provided an adequate explanation to support her step-two conclusion, considering all of the evidence of record.  Moreover, substantial evidence supports the ALJ's step-two determination, because, as explained in the Court's analysis above, the record agrees with the ALJ's finding that Plaintiff's treatments successfully controlled her symptoms.  (R. at 20); *see Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling." (citing *Purdham v. Celebrezze*, 349 F.2d 828, 830 (4th Cir. 1965) and 20 C.F.R. § 404.1530)).

### B.     The ALJ Did Not Make A Conflicting RFC Finding.

Plaintiff argues that the ALJ failed to resolve a conflict between the hypothetical that she

posed to the VE that described an individual with a sedentary RFC and her step-two conclusion

that Plaintiff suffered from no severe impairments. (Pl.'s Mem. at 9-10.) Plaintiff contends that

"the ALJ was torn between absolutely no limitations and limiting the claimant to sedentary

work," which proved "internally inconsistent and extremely confusing." (Pl.'s Mem. at 9-10.)

Defendant responds that, because substantial evidence supports the ALJ's step-two conclusion

that Plaintiff did not suffer from any severe impairments, the regulations and caselaw did not

require the ALJ to conduct an RFC analysis. (Def.'s Mem. at 21-22.) Therefore, the ALJ made

no RFC findings that Plaintiff may challenge. (Def.'s Mem. at 22.)

At step two, if the Commissioner finds no severe impairments, "the claimant is not

disabled and the analysis does not proceed to the other steps." *Hammond v. Astrue*, 2013 WL

8322749, at *2 (D. Md. Mar. 5, 2013) (citing 20 C.F.R. § 404.1520). If, however, an ALJ elects

to make RFC findings and those findings prove inconsistent with the ALJ's step-two conclusion,

remand may be appropriate. *See Little v. Colvin*, 2016 WL 4446325, at *5 (W.D. Va. Aug. 2,

2016) (recommending remand, in part, because "the ALJ assigned [the plaintiff] a light RFC,

[which] reflect[ed] major limitations in [the plaintiff's] ability to work and [could] not be

reconciled with the ALJ's finding of no severe impairments" (citing *Parker v. Comm'r Soc. Sec.*,

2014 WL 1239776, at *6 (M.D. La. Mar. 25, 2014)), *report and recommendation adopted*, 2016

WL 4444925 (W.D. Va. Aug. 23, 2014).

Here, after concluding that Plaintiff did not suffer from an impairment or combination of

impairments that significantly limited her ability to perform basic work activities, the ALJ

explained that, "[i]n assessing [Plaintiff's] subjective complaints alone," the ALJ asked the VE

whether Plaintiff could return to her past relevant work "if she were limited to the sedentary level of exertion" with additional limitations, and the VE responded that Plaintiff could. (R. at 21-22; *see also* R. at 51-54 (VE's testimony).) Therefore, the ALJ noted that "even if [she] found [Plaintiff's] impairments severe, the record as a whole would still support a finding of not disabled." (R. at 22.)

The Court agrees with Defendant that the ALJ's explanation that Plaintiff would still be found not disabled even if the ALJ credited all of her subjective complaints does not constitute a conflicting RFC finding. Rather, the ALJ merely reinforced her ultimate conclusion that Plaintiff did not qualify as disabled by pointing out that Plaintiff could perform her past relevant work even at a sedentary RFC that captured of all Plaintiff's subjective complaints. Although Plaintiff maintains that the ALJ's opinion proves internally inconsistent and confusing, because the ALJ discusses the sedentary RFC alternative, the Court finds the ALJ's explanation both consistent and clear. (Pl.'s Mem. at 9-10.) The ALJ did not find Plaintiff in fact limited to the sedentary RFC with additional limitations, which would prove inconsistent with her step-two conclusion, but merely highlighted that an opposite finding that credited all of Plaintiff's complaints would still lead to Plaintiff being found not disabled, thereby bolstering the ALJ's ultimate conclusion. The Court finds no caselaw or regulations that preclude ALJs from pointing to additional evidence in the record to support their conclusions — in fact, the law requires that ALJs do just that. *See Woods v. Berryhill*, 883 F.3d 686, 694 (4th Cir. 2018) ("[T]he ALJ must *both* identify evidence that supports his conclusion *and* 'build an accurate and logical bridge from [that] evidence to his conclusion.'" (emphasis supplied) (quoting *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016)). Therefore, the Court finds no grounds for remand.

## V.    CONCLUSION

For the reasons set forth above, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 14) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 16) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

Let the Clerk forward a copy of this Report and Recommendation to United States District Judge M. Hannah Lauck and all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

/s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date: August 15, 2019